UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CLEON WATSON,

                       Petitioner,

        -against-

                                               **MEMORANDUM & ORDER**

JAMES WALSH, Superintendent,                 07 CV 1198 (RJD)
        Sullivan Correctional Facility

                       Respondent.
------------------------------------------------------------X
DEARIE, Chief Judge.

      Petitioner Cleon Watson, serving a sentence of 25 years to life for his conviction of second degree murder, seeks a writ of habeas corpus pursuant to 28 U.S.C. §2254. He claims that the trial court's refusal to admit the grand jury testimony of a witness who died before trial deprived him of his constitutional right to present a defense. He also claims that he received ineffective assistance from his appellate attorneys because they did not pursue a claim of ineffective assistance of trial counsel.

      For the reasons set forth below, the application is denied and the petition dismissed.

## BACKGROUND

      Petitioner was convicted of "depraved indifference" second-degree murder for having opened fire, along with Christopher Thomas, upon a crowd gathered on a Brooklyn street during the early morning hours of July 11, 2000.

      The state's case rested primarily on the testimony of the cooperating accomplice Thomas.[1] Friends for more than six years, Thomas and petitioner were both members of the

---

[1] Thomas pled guilty to first-degree manslaughter in exchange for his testimony and a 12-year sentence.

Bloods gang. On the night of the shooting, Thomas and petitioner went to a "stash house" where they obtained weapons (petitioner, a .380 chrome gun and Thomas, a .9 millimeter) and made a drug sale to "Crackhead Johnny," who then drove them in a Ryder truck to the vicinity of East 23rd Street, the unofficial border between the territories of the Bloods and their rival gang, the Crips. Thomas and petitioner went there looking for Pana Lock, a Crip with whom Thomas had "had words" the day before. Thomas and petitioner did not "actually discuss" a plan, but according to Thomas, petitioner "knew who [Thomas] wanted to go get." Thomas was wearing "red [and] black" (the Bloods' colors), but could not recall what petitioner was wearing.

Exiting the Ryder truck just short of their destination, petitioner and Thomas drew their guns and walked, soon turning a corner where they encountered a crowd, including some children and elderly adults, on the stoops of buildings and on the street. Thomas noticed Lock moving away from the crowd and shot at him twice, while petitioner fired several shots directly into the crowd. Petitioner paused briefly as the crowd began to scatter, and then pursued them, firing several more shots into the moving group. Andre Jones, not a member of either gang, was killed, and four others (including Lock) were shot, but not fatally.

Thomas fled, tossed his gun away, and hid at his grandmother's nearby apartment before escaping to South Carolina, where he was arrested two months later on armed robbery charges. Soon thereafter, he offered to cooperate in the Brooklyn murder case.

Petitioner was arrested a week after the shooting and identified in a line-up by Clyde Victor, a member of the Crips who knew petitioner from the neighborhood for several years and who was part of the crowd on the street the night of the shooting. Victor testified that while hw was smoking marijuana with Lock, he observed Thomas and petitioner, armed, arrive just before

-2-

the shooting began. Victor shouted to his friends to "look out" and then quickly jumped down into a basement stairwell and so did not observe the actual shooting. He testified only that he heard several gunshots from what sounded to him like more than one gun.

Ballistics confirmed that two different guns had been fired as both .380 shell casings and .9 millimeter bullets were recovered from the scene. A .380 bullet killed Jones, and all five .380 casings came from the same gun.

Arguable bases for discrediting Thomas and Victor were fully brought out by the prosecution and defense. Thomas had convictions for drug sales, auto theft, gun possession, and assaulting a police officer; committed several armed robberies for which he had not been charged; used cocaine and marijuana daily; and when he first admitted his role in the shooting, he claimed that people in the crowd had shot at him first. Victor had convictions for robbery, assaulting a police officer, drug sales, and domestic violence; used marijuana during the events to which he testified; and had initially told police, contrary to his later trial testimony, that he had observed the actual shooting.

The defense did not call any witnesses, but sought to advance the theory that Thomas was the sole shooter by challenging the credibility of Thomas and the probative value of what Victor merely heard but did not see. Counsel also elicited from the ballistics expert that .9 millimeter and .380 bullets are from the same family, that a .9 millimeter gun (the one Thomas admitted using) can fire a .380 bullet, that there could have been one shooter who had moved around a great deal, and that the recovered bullets and casings could have rolled or been kicked around.

In further support of the "one-shooter" theory, petitioner sought to admit the following grand jury testimony of William Edwards, one of the shooting victims who later died in an

unrelated incident:

> Q. And what happened as you got to Newkirk Avenue?
>
> A. I seen [sic] somebody shooting like in front of me towards that way.
>
> Q. And when you say they were shooting in front of you, were . . . they shooting in your direction or the opposite direction?
>
> A. Opposite direction, straight. I was behind them.
>
> Q. How could you tell they were shooting?
>
> A. Because I seen the sparks and heard the noise.
>
> Q. So, you seen [sic] the muzzle flashes from their hand?
>
> A. Yes.
>
> Q. Could you see the gun?
>
> A. Not really.
>
> Q. You just saw the flashes?
>
> A. Yes.
>
> Q. What happened as they were shooting in that direction?
>
> A. I think he was shooting at somebody else and he turned and started shooting the next way, and then I fell and my hand was still in the air. He shot me in the air.
>
> Q. How far were you from him at this time?
>
> . . . .
>
> Q. Mr. Edwards, were you able to see the individual who was shooting at you, his face?
>
> A. No, it was too dark.
>
> Q. And did you see what, if any, clothing he was wearing?

-4-

A.   He had a red shirt on.[2]

Defense counsel argued that Edwards's testimony established that there was one shooter, and that that shooter must have been Thomas, who admitted he was wearing red and black. The trial court, however, ruled that while Edwards's testimony was reliable, it was neither material nor exculpatory and therefore not admissible. On the issue of the number of shooters, the court concluded that the prosecutor's questions "never really probed" that specific detail with Edwards, that "it [was] not clear" from Edwards's testimony "whether or not there was more than one person involved in the shooting," and that Edwards had not identified the shooter. On the matter of clothing color, the court noted that "red and black" (the colors Thomas admitted wearing) "is not the same as red" (the color in Edwards's testimony), that Thomas had not been asked to describe "how much of [the shirt] was red and how much of it was black," and that there was no trial testimony about what petitioner was wearing at the time of the shooting. The court also took judicial notice that Bloods "customarily wear red clothing" and reasoned that "it [was] not unlikely that a Blood member would be walking around wearing a red shirt and that could include any member of the Bloods, not just [Thomas] - - not just [petitioner] assuming he is a member of the Bloods, or anyone else."

For these reasons, the court found that Edwards's grand jury testimony was not material, not exculpatory, not "helpful" and in fact likely to "generate confusion."

On petitioner's appeal, the Appellate Division concluded that the trial court "properly denied [petitioner's] request to introduce the grand jury testimony of a witness who had since

---

[2] We have not been provided with the transcript of Edwards's Grand Jury Testimony, but rely here on the identical reproduction of the passage in both petitioner's state appellate brief and respondent's brief in opposition to the habeas petition.

become unavailable to testify at trial." People v. Watson, 14 A.D.3d 721 (2d Dep't 2005), lv. app. denied, 4 N.Y.3d 857 (2005). The Appellate Division explained that "[e]vidence of this type must be admitted when it is material, exculpatory and has sufficient indicia of reliability," id. (internal quotation omitted), but agreed with the trial court that, "[a]lthough the unavailable witness's testimony did carry sufficient indicia of reliability . . . it was nevertheless properly excluded . . . because, even if believed, it was neither material nor exculpatory." Id. (internal citations omitted).

## DISCUSSION

### I. Controlling Habeas Standards

When a habeas petitioner's claim has been addressed on the merits by the state court, habeas relief is not available unless the state court decision is contrary to or an unreasonable application of clearly established federal law as determined by the holdings of Supreme Court decisions. See 28 U.S.C. § 2254(d); Carey v. Musladin, 549 U.S. 70, 74 (2006); Rosa v. McCray, 396 F.3d 210, 219-20 (2d Cir.), cert. denied, 546 U.S. 889 (2005). To prevail, a habeas petitioner must show that the state court's application of Supreme Court law "was not merely incorrect, but objectively unreasonable." Hemstreet v Greiner, 491 F.3d 84, 89 (2d Cir. 2007) (internal quotation marks omitted), cert. denied, __ U.S. __, 128 S.Ct. 962 (2008). See generally Bell v. Cone, 535 U.S. 685, 693 (2002) (Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law"); Brecht v. Abrahamson, 507 U.S. 619, 633-34 (1993) (even before AEDPA, habeas corpus was an "extraordinary" remedy, "designed to guard against extreme

malfunctions in the state criminal justice systems," and "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged . . . in light of modern concepts of justice") (internal quotation marks and citations omitted). Even if trial error of constitutional magnitude is shown, the writ may issue only if that error "had [a] substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (internal quotation marks and citation omitted). We apply the Brecht harmless error test "whether or not the state appellate court recognized the error and [whether or not it] reviewed [the error] for harmlessness." Fry v. Pliler, 551 U.S. 112, 121-22 (2007).

## II. The Trial Court's Refusal to Admit Edwards's Grand Jury Testimony

The trial court's refusal to admit Edwards's grand jury testimony does not entitle petitioner to habeas relief. Under Supreme Court law, a state court's evidentiary rulings, even if erroneous under state law, generally do not present constitutional issues cognizable under federal habeas review. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"). Unless the challenged evidentiary ruling affects the fundamental fairness of petitioner's state court trial, the claim is not reviewable here. Dowling v. United States, 493 U.S. 342, 352 (1990).

We entertain petitioner's claim only insofar as he has framed it in constitutional terms as implicating his right to present his defense. See, e.g., Crane v. Kentucky, 476 U.S. 683, 690 '(1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense'"). "A defendant's right to present relevant evidence is not, however, unlimited; rather it

is subject to 'reasonable restrictions.' Central among these restrictions are state and federal rules of procedure and evidence 'designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" Wade v. Mantello, 333 F.3d 51, 58 (2d Cir. 2003) (internal citations omitted). "The erroneous exclusion of evidence under state rules of evidence violates a defendant's federal constitutional right to present a defense only if the omitted evidence creates a reasonable doubt that did not otherwise exist." Woodson v. Mazzucca, 110 Fed. Appx. 148, 2004 WL 1789904, *2 (2d Cir. 2004) (internal quotation marks and citations omitted).

We are on all fours with the trial court's analysis of Edwards's testimony and readily find that that testimony could not have created a reasonable doubt that did not otherwise exist. For the reasons expressed by the trial court, we conclude that Edwards's testimony would not have supported the defense theory that there was only one shooter and/or that the red-garmented individual referred to in the testimony was Thomas and not petitioner. The Appellate Division's affirmance of the trial court's ruling was not, therefore, contrary to or an unreasonable application of Crane.

### III. The Ineffective Assistance of Appellate Counsel Claim

Petitioner asserts that he received ineffective assistance of appellate counsel because appellate counsel did not raise an ineffective assistance of trial counsel claim attacking several features of trial counsel's performance. Petitioner appropriately raised his appellate ineffectiveness claim in an application for a writ of error coram nobis, which his former appellate attorneys opposed in a detailed affirmation. In a summary order citing Jones v. Barnes, 463 U.S. 745 (1983), the Appellate Division denied the application, concluding that petitioner "has failed to establish that he was denied the effective assistance of appellate counsel." People v. Watson,

33 A.D.3d 827 (2d Dep't 2006).

To obtain habeas relief on the basis of an ineffective assistance of appellate counsel claim, petitioner must show that the Appellate Division's rejection of his claim was contrary to or an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984). See Forbes v. United States, 574 F.3d 101, 106 (2d Cir. 2009) (Strickland applies to appellate ineffectiveness claims). Petitioner therefore must show that "counsel's representation fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Appellate ineffectiveness claims must also square with the Supreme Court's teachings in Jones v. Barnes, 463 U.S. 745 (1983). There, the Court held that appellate counsel has no "constitutional duty to raise every nonfrivolous issue requested by a defendant, 463 U.S. at 747, and recognized that "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." Id. at 751-52.

Where, as here, the claim that petitioner faults appellate counsel for not raising is trial counsel's ineffectiveness, petitioner must meet the demanding Strickland standards at both the trial and appellate levels, a formidable burden that he does not satisfy here. We conclude that neither the alleged shortcomings in trial counsel's performance, nor the failure of appellate counsel to address them, was objectively unreasonable under Strickland. Indeed, the record establishes that petitioner's allegations of deficient performance, although the subject of extensive briefing on his part, lack a factual basis or are otherwise so frivolous that we need not

even reach Strickland's prejudice prong.

Petitioner complains that appellate counsel should have argued that trial counsel was ineffective for failing to object to hearsay that the prosecutor elicited from a host of absent witnesses. We do not find the alleged hearsay, however, in any of the sections of the record to which petitioner had directed us.[3] Similarly, although petitioner seeks to fault trial counsel for failing to object to certain portions of the summation, the record discloses that counsel did make the allegedly unmade objections, such as when the prosecutor argued that Thomas was "even corroborated by [the] street, by word on the street," and when he referred to what "Crackhead Johnny knew."

Petitioner also argues strenuously that his trial attorney mishandled the examination of Clyde Victor, but again, the record establishes just the opposite. Defense counsel pressed the fact that, although Victor had testified on direct that he overheard the shooting from his hiding place, he had previously told the police that he witnessed the entire shooting. To explain his inconsistencies, Victor eventually admitted (on cross): "I don't remember exactly what I said but . . . I was going with what was the word on the street, not exactly what I saw." Counsel thus acted in furtherance of the legitimate strategy of undermining Victor's credibility by suggesting

---

[3] For example, Petitioner seeks to locate error around the references to Crackhead Johnny; Thomas identified this individual as the driver on the night of the shooting but did not attribute any statements to him, nor does this individual otherwise figure materially into the prosecution's case. Petitioner also argues zealously about the investigating detective's reference to "some woman." The detective testified that after having a conversation with some woman, the content of which he did not disclose, he located the Ryder truck—again, no hearsay was elicited. Moreover, defense counsel managed to use this reference to score a small point in petitioner's favor: on cross-examination, counsel asked the detective whether the truck became important "because someone indicated that they'd seen it on the scene," and quickly elicited that latent prints were lifted from the truck and that none matched petitioner.

that he lacked first-hand information.

Yet another ground of ineffectiveness that petitioner advances is counsel's alleged failure to assert that the accomplice Thomas's testimony was not corroborated as required by New York law. But the prosecution did offer two forms of corroboration: the testimony of Clyde Victor that he saw petitioner on the scene with a chrome gun just before he sought cover and heard shots fired, and the ballistics evidence showing that two different guns had been used. In any event, defense counsel did move for a trial order of dismissal on the ground that Victor's testimony was too unreliable to provide the necessary corroboration. Although the court denied the motion, counsel adequately alerted the court to the issue.

Finally, to the extent petitioner is also claiming that appellate counsel should have raised an independent claim of prosecutorial misconduct based on the challenged summation remarks, we find those assertions to be without merit as well. Even if some of the prosecutor's remarks crossed the bounds of proper advocacy, they did not deprive petitioner of a fair trial. See Darden v. Wainwright, 477 U.S. 168, 180 (1986) (to state a constitutional claim based on prosecutorial misconduct, "it is not enough that the [challenged] prosecutor's remarks were undesirable or even universally condemned"); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (constitutional error arises only when the challenged prosecutorial conduct is "egregious" or "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process").

In short, the zeal and prolixity of petitioner's complaints about his trial and appellate counsel are in inverse proportion to the merits of those complaints. Nor is petitioner the first to resort to this tactic. As we have previously had occasion to remark,

> It is indeed unfortunate when a criminal defendant facing a substantial
> term of incarceration genuinely feels that his counsel furnished him with

representation below the standards guaranteed by the Constitution. But this petition illustrates a disturbing misuse of that constitutional claim and of the habeas petition itself. The erecting of such a needless analytical edifice and the relentless sounding of such utterly false alarms as petitioner has done here fall in the category of fanciful . . . antics that have no place in habeas litigation, as they sully the dignity of the great writ and make sport of its special role.

Ault v. Miller, 2008 WL3890373, *8 (E.D.N.Y. 2008)

## CONCLUSION

For the foregoing reasons, the application is denied and the petition is dismissed. Because petitioner has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability shall not issue. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. Coppedge v. United States, 369 U.S. 438 (1962). The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
January 7, 2010

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge